Thank you both. We have the case under advisement. The second case is 21-13086 and forgive me if I mispronounce a few of the names, David Defernato v. Boardwalk Fresh Burgers & Fries, Inc., and Christopher Cathy. You have reserved five minutes for rebuttal and when you are ready, please proceed. All right. Thank you. Good morning, Your Honors. May it please the court? Just wait one second for your opposing counsel. All right. Sorry. You ready? Thank you. Go ahead. Sorry about that. Go ahead. Okay. May it please the court? My name is Christopher Cathy. I'm with Gray Robinson. I represent the appellants in this matter, Chunghong Jia, Nairu Li, Naihan Li, Shulai Wang, Liz Hongyao, Weiwei Zhang, and Chong Zhao. So I was close on my pronunciation. I've had a few years to work on it. Your Honor, my clients are seven Chinese investors who each collectively invested $500,000 each in the Boardwalk Fries Opportunities LP EB-5 project. There are seven plaintiffs that invested this money with the hopes of achieving the American Dream and unfortunately due to the conduct of the defendants, that I want to address with the court today three areas of discussion dealing with the trial court's denial of or rather granting of summary judgment in favor of the defendants. Number one, as it relates to the fraud and negligent misrepresentation claims, I'm going to discuss reliance and whether it was reliance was reasonable. We're also going to discuss the breach of contract claim and the derivative theory in there, piercing the corporate veil, and then also the breach of fiduciary duty claim and constructive fraud, which are one of the same. And again, that was dismissed for lack of duty, as was the negligence claim, but I've only got a few minutes to hit everything. Let me ask you just sort of an initial question to tee it up. You have explained that the LPA provided for $9 million in funding, $6 million coming from the plaintiffs and $3 million coming from BWF management. Was the $3 million in funding ever provided from DiFernandino or any other entity? No, that money was never provided. And as the record is clear, Mr. DiFernandino signed an affidavit on January 17th, 2014. Counsel, so I want to talk to you about fraud and reliance regarding that, which goes directly to what we're talking about here. So as I read your complaint, you based the fraud claim, the negligent misrepresentation claim, and the securities fraud claim on the affidavit, correct? It's based on the affidavit, but the affidavit memorializes the promise to invest $3 million. The problem, well, let me rephrase that or flip it. The misrepresentation that you alleged is contained in the affidavit. That's right. The affidavit is a sworn evidence and proof of that. No, no, no, no. Sorry, of the promise to pay $3 million. Let's do this. Let's go through your complaint. Okay. Because that's where we have to start. The operative complaint we're talking about here is a docket entry 117 at pages 27 to 29. That's the fraud claim, but it's essentially the same for the negligent misrepresentation and the securities fraud claim. Paragraph 145, the defendant supplied an affidavit to the plaintiffs that on its face represented that they would contribute $3 million. Paragraph 146, defendants knew the affidavit was essentially luring them to invest in the opportunity. Paragraph 147, plaintiffs received and reviewed the affidavit before investing and relied on its representations. Paragraph 148, this affidavit was a commitment that the main company and he personally would invest. Paragraph 149, defendant's contributions as memorialized in the affidavit were also a representation that they would cover certain startup costs. Paragraph 153, the representations in the affidavit were knowingly false. Each false statement described in the affidavit was made with knowledge. 154, these statements, the ones in the affidavit were made with intent of misleading for the plaintiffs to rely on it. Paragraph 155, plaintiffs justifiably relied on these false statements. The district court read the complaint as relying on the affidavit. In your brief, you say, quote, the fraud and negligent misrepresentation claims are based on the representation in the affidavit. The affidavit is where the fraud, negligent misrepresentation, and the securities fraud claim are based on, correct? That's correct. Okay, so I'm having a trouble, counsel, I'm having trouble on the reliance part, which is where you started, that's why I'm asking you about it, and that's where the district court did. With regard to the evidence in the record, which seems to suggest that six of the seven plaintiffs never saw the affidavit, and that the seventh plaintiff saw it after he had already invested. So how can we say that they relied on those representations in the affidavit? Well, the affidavit memorializes the promise to Dave D. Fernando, either himself or through Boardwalk Fresh Burgers and Fries, was going to commit $3 million. Lily Wang from New City Advisors, who the defendants admit was the entity or the person responsible for managing this project on behalf of the investors, asked Mr. D. Fernando for proof of the $3 million. And that proof was provided in the form of an affidavit. Ms. Wang was, there's a question, she was an agent for the plaintiffs. Counsel, I think there is a question, but that's a separate issue, because you use plaintiffs in a very liberal way. She might have been an agent for some entity, whether she was an agent for the actual plaintiffs or the defendants you've alleged is a different story. But here's the issue. If the count had said or was based on there is fraud because Ms. Wang told them about the $3 million, that might be a different story. But the claim is based on the affidavit. And if these folks didn't see the thing that you are alleging fraud on, how could they possibly have relied on it? Your Honor, I think that's a, that's a, you're looking, and the district court looked at it as, you know, when we file these complaints, you file them one day based, and you, this is what you and there are other things that you learn. And then there are summary judgment deadlines and things like that. So that doesn't necessarily encapsulate the reality of what was going on. The problem here, there's two problems for you, I think. One is, that's why we allow very liberal pleading standards to amend. And secondly, our case law says that a response, a motion for summary judgment or response to a motion for summary judgment in your case cannot amend the allegations in a complaint. And so what we have here is we have a complaint that's based on an district court order that based on an affidavit. You have two briefs that are telling me that the misrepresentations are those that are in the affidavit. And then you have undisputed testimony that I can see that nobody saw the affidavit before they invested. Okay. So if, if there was no affidavit and it was Dave DeFernando orally promised, okay. And he orally promised to Ms. Wong, she's representing the investors. From our perspective, I don't see a difference. As a matter of fact, the affidavit itself is much stronger than some oral representation. And so what the district court did. So if you had pled, I agree with you. So if you had pled that Mr. DeFernando had specifically told the plaintiffs directly, I'm going to pay $3 million when you pay your six to do this thing, and that didn't happen, then I agree with you. We likely wouldn't be here. Or if the allegations were, he told Ms. Wang to tell them that, and he knew that they were going to tell them that we also might not be having this conversation, but that's not what's alleged. Your honor back, the liberal pleading standards are liberal as it relates to amendments, but they're also liberal as to does this state a cause of action, right? So you've stated a cause of action. We're here on summary judgment. I understand that, but it works both ways. And what the district court ignored was, we have a situation where DeFernando is signing on behalf of an entity that doesn't exist at the time as an authorized signer in the operations management agreement on behalf of the general partner. In that operations management agreement, he agreed to manage the operations, financial oversight, and so forth of this limited game. Corporations aren't just BWF op, okay? There are people behind these corporations, all right? And when he's misrepresenting that he was an officer of a company that doesn't exist. Let me ask you about that. Did you raise before the district court that you were proceeding under theory of promoter liability for the company that didn't exist? I believe we did. I believe we did, but- Can you cite to where you raised that argument to the district court? I don't have it in front of me. Okay. No, but- Can I add to that while you look because you're going to come back? I have a similar sort of question. Can you show me where in your response to the summary judgment for breach of contract, where you even argued that there was a non-existent company? When you get, when you sit down and come back up, take a look at that and let me know where in the section regarding breach of contract did you argue to the district court, he's personally liable on the contract because the company didn't exist? At the time. At the time, right. Sure, all right. Thank you. All right, thank you. All right, Mr. Rusulon. Good morning, Your Honor. May it please the court, Derek Rusulon on behalf of the appellees, Boardwalk Fresh Burgers and Fries and David D. Ferdinando. Mr. D. Ferdinando is in the blue shirt behind me. Mr. D. Ferdinando in the early 80s had a pretty good concept to franchise small Maryland french fry stands generally in shopping malls. It's a family-run business and eventually they expanded to fast casual concept, kind of like a five guys. At the peak, they had 40 locations internationally. Counsel, why isn't he personally liable if the company doesn't exist? Several reasons. First of all, the company, we're talking about Boardwalk Fries LLC. Yeah. So I have an org chart here. I don't need to see the chart. I've studied it. Sure. So Boardwalk Fries LLC, the promise that appellants are talking about is from BWF management. Counsel, how is he not personally liable if the company doesn't, it didn't exist at the time that he signed the agreement? Because it was subsequently formed in 2015. What does that matter? In other words, if you sign and say, I am signing on behalf of something and then you assert protections, corporate protections based on the fact that you're a corporation and that corporation didn't exist at the time that you signed it, how are you not liable on that contract that you signed at that time? Because there's case law on this. It states that if the company is subsequently formed and adopts that contract, which it did. Is there evidence in the record that the company, the later formed company adopted the agreement? Yes. Just by virtue of being in all the the appellees didn't do, it was that came out. That was contemporaneous with the signing of those contracts that that's not after the 2015 when the company is formed. All of that, that literature you're talking about, how could it, how could you have adopted something before it existed? It, the, the entire organizational structure is, is based on that Boardwalk Fries LLC was a member of BWF management, right? Boardwalk Fries LLC. You know, they didn't have, they had their obligation to the general, to the limited general partner, BWF management in the structure. The allegations that appellants are talking about that were breached was from BWF management. So what appellants are trying to do is pierce two levels to try to get to Mr. D for an, but we're not talking about a piercing. I tend to agree with you on piercing the corporate veil. We're talking about something else. And that is that there were representations made to the partnership and to opportunities about what Fries LLC would do. And I agree with you that if that company had existed at that time, then Fries LLC and not necessarily Mr. D Fernando individually would be responsible. But where he signs that and makes those representations for a company that does not exist, my question is where there's no evidence of subsequent ratification once the company does exist, why is he not personally liable? So your honor, this is the Illinois controls versus Langham case, um, 70 Ohio state, third, five, 12, 1994. Um, a promoter of a corporation is not liable if the corporation adopts the contract and the contract provides the performance under it is solely the responsibility of the corporation. There is no contract in which Mr. D Fernando's name is, is obligating anything. Is the adoption though of the later formed company of this agreement that he signed? I think your honor, it was through conduct. I mean, is there, is there a written document saying we, um, we adopt the prior what conduct there's, this is a lack of performance case. What, what conduct did he adopt? It'd be one thing if he actually contributed to the 3 million once there, but nothing got contributed. Nothing happened. Um, setting up the operation operations, look, trying to get sites, um, locking in landlords, um, trying to get the, the, the 10 to 12, um, boardwalk, fresh burgers and fry stores up and running. Um, the chans were responsible for that in a franchise or a franchise relationship. It's the franchisee, which is where the chans, the party that stole plaintiff's money, they were looking for sites and they were operating through boardwalk fries. Cause the boardwalk fries LLC. So you're saying that the P we should rely on evidence that the people who stole and who treated this like a personal piggy bank are the ones who ratified and adopted this thing as well as the conduct of, of, of Mr. D Fernando, um, acting as a franchise or, and, um, you know, communicating with landlords, um, sending schematics over working with architects. You also acknowledge that pointing to the conduct of Mr. D Fernandino could also look like he's personally liable. He was at all times acting as a franchise or on behalf of boardwalk, fresh burgers, but what evidence is there that he was acting as a franchise or once the company was formed, uh, as he, as boardwalk, fresh burgers and fries doesn't every franchise or franchisee relationship, um, sending, you know, um, supplier information, um, working with, um, the development agent, which you understand that he moment in time, if the later formed company adopts the agreement, sure. Then, then you have an argument that it has picked up the liability, but by pointing to Mr. D Fernandino's conduct, it simply looks like he is acting as the individual who signed the agreement. He's acting through his franchise or, um, doing what he does in every, the, this was boardwalk, fresh burgers and fries. First four way into the, the EB five landscape. Um, the chance who they unfortunately got into this business with have done several EB fives, including with the plaintiff's agent. Um, Mr. D Fernando was having boardwalk, fresh burgers and fries. It was an opportunity to grow the brand. Um, the EB five immigration program is very popular with to the EB five, but you're, you're not responding to my question. You've got a man who signed an agreement that at least at the time it was signed, he, there is no company. So he has a, there's at least a personal liability potential here. And then he starts acting and you're pointing to that conduct to show that he's acting as the later formed company. And I'm asking you to link, you've got individual liability and I want you to show how it transfers to corporate liability and tell me how people knew he was acting as on behalf of the company. So, I mean, I would argue he was acting on behalf of BWF management, which was formed at that time. That was a general partner. Um, the general partner consists of boardwalk fries, LLC, which also, which also consisted of one of the Chan entities, archway partners. Um, and then as well as he wasn't personally going back to your handy chart that you have sitting there, he wasn't personally a general partner. He was only a general partner through LLC. Correct. And so if LLC didn't exist, then his efforts were not on behalf of the general partnership. Um, could not have been, well, they were, I mean, I know you're saying that, but they could not have been as a matter of law. If the entity with which that was the general partner did not exist until the, until the company was founded. In other words, counsel, you can't rely on corporate formalities if you're not willing to be formal with them. So the company was formed, by the way, all these companies were formed by the Chans, the tortfeasors. Mr. D. Ferdinando was essentially drafted into these and taken advantage of just like the plaintiffs were. Um, you know, he, what he is also a victim and his company is a victim here. I mean, they've incurred significant damages as a franchisor. They have, we understand that no one's, no one's imputing anyone's motives here. All we're talking about here is there's an argument for breach of contract or a contract that your client signed on behalf of a company that didn't exist. And so what, what all we're trying to, to explore is how possibly he, how could he not be personally liable on the contract that he signed on the dotted line? And that said that he and his company would do these things, would do certain things where the corporate formality was not formed. So your honor, I don't think it gets that far because the obligations that, that the plaintiffs are complaining about was the, was for BWF management, BWF MGT. And no, the, the agreement also had obligations by Fry's LLC, did it not? And by the, and by the plaintiffs in this case to do things as the franchisor to help get this thing along. There was an operations management agreement that, um, you know, that BWF management entered into with Boardwalk Fry's LLC. Once again, plaintiffs are not a party to that agreement. I understand. Okay. And that, and that's what Boardwalk Fresh Burgers and Fries were to do. And what's essentially codified in that agreement is, um, what a franchisor would do. Um, appellants like to say that, that Mr. DiFernando or Boardwalk agreed to, to certain, to, uh, manage the investments or the accounting. What that agreement states is that Boardwalk Fresh Burgers and Fries would be, once the restaurants are up and running, would be in charge of inventory control, the accounting protocols that a franchisor does. Mr. DiFernando testified this is, um, extensively in his deposition. Um, my clients are, we're not the safeguard, we're not safeguarding plaintiff's funds. That wasn't their thing. They, they do French fries. They don't do EB5, you know, um, immigration programs. They were going to, when the restaurants got up and running, they were going to run them. They were going to get the upstart, um, and provide all their, all their information so that hopefully these restaurants could be a success. That's how Boardwalk Fresh Burgers and Fries make money. It's within their interest for these, uh, these restaurants to get started, um, to bring income in because they only get compensated based on, on royalties, royalties or a, um, in this case, a development agent fee, which they do. So, um, you know, any, you know, allegation that, you know, Mr. DiFernando entered into this personally, I don't think it's supported by, by, by his conduct. You know, um, it was all parties to this case knew that Boardwalk Fresh Burgers and Fries was not going to come into play until the restaurants were starting. That's what that operations management agreement stated. So I would like to touch on, um, a couple of other things regarding, um, I, I believe I, I filed some supplemental authority on Monday, uh, to catch Imani versus Target case. Um, it's a, it's an 11th circuit case, which states that. I want to go back. Uh, I want to talk about the, the constructive fraud or fiduciary duty. Does your client or the plaintiffs owe any fiduciary duty to, I'm sorry, your clients owe any fiduciary duty to the plaintiffs? No. So going back to the issue of, of whether he's personally liable, if Fries didn't exist and he signed the operating management agreement on behalf of a company that didn't exist. And that agreement said that he would assist in creating and employing a minimum of 10 with a target of 12 direct full-time jobs for each EB-5 investor to execute all certifications and other documents necessary to qualify under the EB-5 program and USCIS regulations and to cooperate, uh, with, uh, the other corporations, uh, for all the EB-5 reporting requirements. Does that not obligate him to be involved with the EB-5 program? So there are two members of Boardwalk Fries LLC. One of them was Archway Partners, which is a Chan run entity. I agree. They may have duties too. And that, that was the EB-5 responsibilities were, was the Chans. But if, if the agreement obligated Fries LLP to cooperate with the Chan entities for all EB-5 reporting requirements, and I'm reading directly from the operating agreement right now, um, does that, and, and he's personally liable for that because he signed on behalf of a company that didn't exist. Does that not make him in a special relationship or give some fiduciary duties to the plaintiffs? No, I, I, I don't, your honor. Why? And well, first of all, that was on behalf of BWF management, which did exist at that time. That's who, that's who's signing the LP agreement. But that agreement obligated both entities to certain things. And I'm reading what it obligated EB, uh, Fries LLP to do. It was to quote, cooperate with the Chan entities for all EB-5 reporting requirements, right? So I'm not reading that incorrectly, am I? Um, I, I don't not have it in front of me. Okay. That is, that is the, the LP agreement. That's the operating agreement, the operating management agreement. Okay. So BWF management as a whole, that's the general partner. They can, they consist of, um, Boardwalk Fries, um, LLC, which is not my client. It's what, um, the subsequently formed company and then Archway and then my clients. Um, that responsibility is from the, it's for the general partner, BWF management LLC. And within that, those responsibilities, they were divvied up between the Chans and my clients. And my client's obligations were the restaurant side of the business. I just read to you at least two of the ones where your client did things about creating a certain number of jobs, the minimum you would need for an EB-5 investor and cooperate with reporting requirements for those because the franchisor would have to say, here are the things that we are doing in order to qualify for the EB-5, right? Correct. I mean, you know, once again, my client is not in the EB-5 business. Why does he not owe those duties directly because the entity didn't exist to those who were the beneficiaries of those duties? Well, first of all, that was what the Chans were supposed to do. And secondly, Boardwalk Fries, LLC was subsequently formed and beginning the performance before the Chans absconded with plaintiffs $3.5 million. Um, they adopted the conduct by starting to look for sites. They changed territories to try to get, um, put a franchise, uh, in Florida after, um, uh, they, they didn't want to do it in Ohio anymore. Um, so basically trying to perform under the agreement can be considered an adoption of, of, and there was no... Counsel, who is they? You said after the company was formed, they. Oh, I'm sorry. Um, the Chans were responsible for site selection. So they started getting some sites, actually did sign some agreements with, with some landlords and then Boardwalk Fries, uh, Boardwalk Burgers and Fries, my clients started giving additional information and communicating with architects to try to get these restaurants up and running. So by trying to perform under the agreement of getting franchises set up, that is the adoption of, uh, of the prior, um, uh, signing of... Plaintiffs represented themselves as being accredited investors. Did that have any bearing on any of the court's view of how to review this and to assess it? Well, I, I think, you know, and in their depositions, I think, and this is going more to the reliance, it's just that the plaintiffs, they didn't review anything. I don't, they didn't rely on anything. They wanted to get into this country and they, all of them admitted, they signed whatever was given, was given to them. I don't think they read really any of it. And a would not be considered accredited investors. Um, they just signed everything and because they wanted to, um, get this process started. All right. Thank you. Thank you very much. Mr. Cathy, you have five minutes and I know you have some questions from the court pending. As far as in the opposition and the underlying, um, summary judgment, um, I didn't raise the issue of, um, indirect reliance or promoter liability. Um, or the, or the issue of, of not signing the. On behalf of the non-existent company. Right. It's actually raised in the fiduciary duty section. Right. But not in the breach of contract. Correct. That's right. Um, that's a, that's a bit of a problem, is it not? I mean, that's a preservation issue for us. Okay. But look, I don't think there's any dispute that the company didn't exist, um, at the time anywhere. It's a, it's a fact that's essentially been admitted. I understand, but we review district court orders and, and put yourself in the position of being a district court right now. So all you can rule on is that what you're given. And so the district court says, these are the arguments that are made. I'm going to rule on all those. The district court here wrote what a 50, 60, 70 page order. I mean, did a thorough job going through everything. And then it comes to us and a new argument is raised. And then we have to, we then decide that on a completely new argument that the district court didn't have any opportunity to rule on. I mean, that's not really fair, is it? Well, let me say this. I don't think that, uh, the issue of whether the company was non-existent, uh, or, or how I raised it in the underlying case or, um, is as dispositive as, um, your honor stated. What I think is most important to look at here is, and if you listen to Mr. Roussillon's, um, presentation in answer to some of your questions, think about it like this. They're trying, they told the district court there was an absence of evidence to support plaintiff's claims. We are nothing more than a franchise or a fast casual restaurants. Mr. Roussillon stood up here and said, all we were doing was acting like a franchisor, but then Mr. DeFernando's testimony that he was on the management team, he was there to lend credibility to this project, um, so that people didn't think it was a sham, um, that he was signing documents on behalf of some entity, right? But he, but he, but counsel, if he was doing that on behalf of a, of an entity, he, unless you can pierce the corporate veil, which I, I have, I'm not sure that you've, you've met that burden. I think I did agree with the district court here, but if you can't pierce the corporate veil, then that, and that corporation means something, whether you believe it or want to it or not, that formality matters under our law. So the only issue is why I think I won't, I'm not going to speak for judge branch, but I assume why she asked her question and why I've asked my questions is because I think it does matter if the corporate, if the formality was not met and if the corporation didn't exist. And so preserving that argument and preserving it for the district court to then raise it here does matter to me. That's why I'm, I'm, I'm doing this. I'm not doing this for just to give you a hard time. I'm doing this because I'm trying to understand both the record and what the arguments are that are preserved for us. It's a very difficult case from the plaintiff's point of view, uh, seven Chinese investors who don't speak English and are trying to get, you know, do this, do the and they rely upon corporate operators. One of which was Mr. D Fernando, who's there to lend credibility because no investor was going to invest into this project with their money alone, with the chance who there's no dispute have had no credibility, right? My clients testified in the deposition that the brand Boardwalk standing behind this matter. And that's the reason why affidavit was so important and why the representations were so important. But the problem you have here is they sit here and say, we were just a franchisor. Well, the evidence says otherwise. That's the problem. He's signed an interrogatory answers that say, who just signed this, um, operations management agreement, limited partnership agreement on, on behalf of Boardwalk fresh burgers and fries. Then you look at his affidavit and support the summary judgment motion. And he's got, he's saying he's never taken any action, never done anything about his company, never had any ownership interest in. Well, where's the truth? These are credibility issues that can only be determined before a jury. And to snatch that from my client and deny them the right to a jury trial is absolutely improper. And we'd ask the court to reverse. Thank you. We have your case under advisement.